```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
      v.                        )    No. 4:10 CR 595 JCH/DDN
                                )
BRIAN LEWIS HEDRICK, et al.,    )
                                )
            Defendants.         )
```

**ORDER AND RECOMMENDATION**
**OF UNTIED STATES MAGISTRATE JUDGE**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). An evidentiary hearing was held on February 23, 2011.

Pending before the court are the oral and written motions of defendant Brian Lewis Hedrick to suppress evidence (Docs. 59, 96, 117), the oral motion of the government for a determination of the admissibility of arguably suppressible evidence (Doc. 60), and the written motion of defendant Hedrick to sever the charges against him for a trial separate from co-defendants (Doc. 95).

**I.  MOTION TO SEVER**

Defendant Hedrick has moved to sever his trial from that of co-defendants Brett Crawford, Kenneth A. Keil, Stacy Cole, and Christopher Watson. (Doc. 95.)

The court has already found joinder of these defendants' trials proper. United States v. Crawford, et al., No. 4:10 CR 595 JCH/DDN (Docs. 99, 104). Thus, the court turns to defendant Hedrick's argument for severance under Rule 14 of the Federal Rules of Criminal Procedure.

In support of his argument for severance, defendant Hedrick argues (1) that the government intends to present evidence against defendant Keil for criminal acts allegedly committed solely by defendant Keil, and that the jury will improperly consider that evidence against him; and (2) that he and co-defendants are likely to present mutually antagonistic

defenses, and that as a result, a joint trial would relieve the government of its burden.

"Once defendants are properly joined under Rule 8, there is a strong presumption for their joint trial, as it gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." United States v. Flores, 362 F.3d 1030, 1039 (8th Cir. 2004). Despite the judicial preference for joint trials, if the joinder appears to prejudice a defendant, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires. See Fed. R. Crim. P. 14(a); Zafiro v. United States, 506 U.S. 534, 539 (1993); United States v. Boyd, 180 F.3d 967, 982 (8th Cir. 1999). "To grant a motion for severance, the necessary prejudice must be 'severe or compelling.' " United States v. Pherigo, 327 F.3d 690, 693 (8th Cir. 2003).

Regarding defendant Hedrick's first argument, whether or not the jury will be able to compartmentalize the evidence is best determined at trial when the trial court can consider such factors as the complexity of the case, whether any of the defendants were acquitted, and the adequacy of limiting jury instructions and admonitions to the jury. Richardson v. Marsh, 481 U.S. 200, 211 (1987); United States v. Ghant, 339 F.3d 660, 665-66 (8th Cir. 2003); United States v. Sazenski, 833 F.2d 741, 745-46 (8th Cir. 1987).

Regarding defendant Hedrick's second argument, "[a]ntagonistic defenses require severance only when there is a danger that the jury will unjustifiably infer that *this conflict alone demonstrates that both are guilty*." United States v. Sandstrom, 594 F.3d 634, 644 (8th Cir. 2010). Further, "[m]utually antagonistic defenses are not prejudicial *per se*," and Rule 14 "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Id. See also United States v. Payton, --- F.3d ---, 2011 WL 668060 at ** 5-6 (8th Cir. 2011). Other than to argue that another defendant is criminally responsible, and that he is not, defendant Hedrick has not specifically described how his and his co-defendants' defenses, especially co-defendant Keil's, are mutually

antagonistic sufficiently to cause the jury to unjustifiably infer that both are guilty.

At this pretrial stage of the proceedings, defendant Hedrick has not made a sufficient showing to sever his trial. Therefore, the court will deny defendant Hedrick's motion to sever without prejudice. Upon a sufficient showing during trial, defendant Hedrick may refile his motion to sever.

## II. MOTION TO SUPPRESS

Defendant Hedrick has moved to suppress his statements and the physical evidence obtained pursuant to the search after he was advised of his <u>Miranda</u> rights and after invoked his right to counsel. (Docs. 59, 96, 117.) From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. On June 22, 2009, defendant Brian Lewis Hedrick was interviewed at the Missouri Highway Patrol Troop C Headquarters. Hedrick had been told that his name came up during an investigation into stolen trailers, and agreed to come to the station to give a statement.

2. Hedrick drove himself in his own car to the interview, and arrived at the station between 9:30 and 9:45 am. St. Charles County Sheriff's Department Detective Ross Bishop arrived at the station at the same time, and exchanged greetings with Hedrick. Hedrick was then greeted inside the station by Missouri Highway Patrol Sergeant David Bauer. Hedrick signed in as a visitor, and was escorted from the entrance of the station, through 3 secure doors, to an interview room. Prior to entering the interview room, Hedrick was not searched, fingerprinted, photographed, or handcuffed, and was allowed to keep his cellular phone with him. The interview room contained four chairs and a two-way mirror. Hedrick was not told where to sit, and was not told that he had to stay in the room. The door to the interview room was unlocked.

3. At the beginning of the interview, only Missouri Highway Patrol Sergeant Jeffrey Paul and Sgt. Bauer were inside with Hedrick.

Det. Ross Bishop, National Insurance Crime Bureau Investigator Larry Liggett, and St. Louis County Police Department Detective Bill Muller observed and listened to the interview from the other side of the mirror. Each of the officers were wearing casual clothing, and had their firearms and badges visibly displayed on their belts. Throughout the interview, Hedrick was not handcuffed, shackled, threatened, beat, or promised anything. None of the officers drew their firearms or deliberately showed their badges to Hedrick.

4. Sgts. Paul and Bauer began the interview by identifying themselves and the nature of the interview. Hedrick was not read his <u>Miranda</u> rights, but was told that the interview was being recorded.[1] After a brief discussion, Hedrick wrote his statement, finishing at 10:15 a.m. Sgt. Paul signed the statement as a witness. (Gov. Ex. 1.) Hedrick then read the statement aloud so that it would be included in the audio recording. Sgts. Paul and Bauer then began asking Hedrick questions designed to verify his statement and obtain additional information. Sgts. Paul and Bauer questioned Hedrick about the purchase, sale, and titling of a trailer that Hedrick had once owned. The officers also asked Hedrick about his and his family's involvement in the purchase, transportation, and sale of that and other trailers. After a few minutes, Inv. Liggett entered the interview room to ask additional questions. Although the conversation at the beginning of the interview was casual, the questions became more pointed and began revealing inconsistencies in Hedrick's statement. Hedrick was confronted about a trailer that had been recovered in Perry, Missouri, which had been stolen and re-tagged. Inv. Liggett also confronted Hedrick with the bill of sale for the trailer. After approximately 44 minutes, Sgt. Paul orally read Hedrick his <u>Miranda</u> rights, and told Hedrick that he was not under arrest.

5. Sgt. Bauer became animated while questioning Hedrick, and expressed his frustration with what he believed Hedrick and others had

---

[1] At the end of the evidentiary hearing, the government provided the court with two audio CDS on which approximately two hours of the interview was audio-recorded. These CDS have been marked Government Exhibits 3-A and 3-B and have been submitted to the clerk for filing.

done.  Sgt. Bauer told Hedrick that it was a "no brainer" that he could charge him for two crimes.  One of the other offers stated that if Hedrick did not cooperate, they would arrest his mother "at the most embarrassing point of her day."  After further questioning, Sgt. Paul said, "Everybody take a step back."  Hedrick was not getting aggressive, although his face was red.  After additional questioning, Hedrick stated, "To be honest with you, I think I need an attorney now.  I didn't know I was coming in to all this."  Sgt. Paul told Hedrick that he had the right to stop the interview at any time, although he could continue talking if he wanted. The interview continued, although the tone became more serious as the questions became more pointed.  During the questioning, one of the officers commented that he knew the prosecutors like friends, spoke with the prosecutors on a first name basis, and called the prosecutors on their cellular phones at home with questions.

6. After further questioning, Hedrick said that he was uncomfortable with so many people in the room.  Sgt. Bauer said to Hedrick, "I'll get out of your face" and left the room, although he had not been physically close to Hedrick's face.  Rather, this statement was a reference to the nature of the questions he had been asking Hedrick. Sgt. Paul and Inv. Liggett continued questioning Hedrick.  Dets. Bishop and Muller entered the interview room, and Sgt. Paul left.  Hedrick was not told he had to stay in the room, and the door remained unlocked.

7. Around noon, the officers asked Hedrick if they could go to his house and look at his trailers.  Hedrick said they could.  When asked to fill out a Consent to Search Form, Hedrick said that he did not mind the officers looking at his trailers, but he did not want them to search his house because his girlfriend and children were there.  Hedrick was hesitant to sign the form, and said "I don't want to sign this because I don't know what I'm doing."  Det. Muller told Hedrick that he could be arrested, and that he could get a search warrant for his house and for his mother's house, without his consent.[2]  Det. Bishop and the other officers assured Hedrick that they would not search his house, after

---

[2] At this point in the interview, the recording device malfunctioned and did not continue recording.

which Hedrick agreed to the search. Det. Bishop began filling out a Consent to Search Form while in the interview room.

    8.    Thereafter, the officers and Hedrick drove to Hedrick's house. Sgt. Paul rode in Hedrick's car while Hedrick drove. The car ride was amicable, and lasted between 15-20 minutes. While in Hedrick's driveway, Det. Bishop added to the Consent to Search Form, "*<u>NOT</u> <u>TO</u> <u>INCLUDE</u> <u>HOUSE</u>*". Hedrick had no questions, and signed the form. (Gov. Ex. 2.)

    9.    Once Hedrick signed the form, the officers began searching his trailers, garage, and outbuildings. While the officers were searching, Hedrick was talking, answering and asking questions, and helping the officers by identifying items. Hedrick's house was not searched. Hedrick never told the officers to stop searching or to leave, or that he was unhappy or minded people being on his property. Hedrick was neither handcuffed nor shackled, and his movement was not limited, although one of the officers always kept track of his location. During the search, Det. Bishop found and seized a metal plate that had been struck with VIN stamps consistent with those of the stolen trailers. The officers also found a license plate associated with the stolen trailers, but it was not seized. In total, the search lasted between 60-90 minutes, after which the officers left. Hedrick was not arrested.

**DISCUSSION**

Defendant Hedrick argues that his statements and the physical evidence obtained after he was read his <u>Miranda</u> rights and after he invoked his right to counsel should be suppressed. (Docs. 96, 117.) He argues that once he was read his <u>Miranda</u> rights, he expressed his desire to speak to an attorney, and that the law enforcement officers ignored his request and continued to question him. (<u>Id.</u>) He argues that as a result, his statements were made absent a voluntary, knowing, and intelligent waiver, and his consent to search was not voluntary because it was obtained through coercion. (<u>Id.</u>)

The government bears the burden of establishing the constitutional admissibility of a defendant's statements by a preponderance of the evidence. <u>United States v. Boslau</u>, --- F.3d ---, No. 10-1167, 2011 WL 500204, at *6 (8th Cir. Feb. 15, 2011). <u>Miranda</u> requires law enforcement

agents to provide certain warnings before interrogating an individual who is in custody.  United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011); Miranda v. Arizona, 384 U.S. 436, 444, 461 (1966).  However, "[t]he requirements of Miranda are triggered only when a defendant is both in custody and being interrogated." United States v. Head, 407 F.3d 925, 928 (8th Cir. 2005).  That said, an individual may waive the rights contained in a Miranda warning, provided the waiver "is made voluntarily, knowingly, and intelligently."  Miranda, 384 U.S. at 444; United States v. Harper, 466 F.3d 634, 643 (8th Cir. 2006).

Similarly, "[a]lthough a warrantless search presumptively violates the Fourth Amendment, voluntary consent to a search is a well-recognized exception to the warrant requirement." United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010).  However, consent to search is valid only if it is voluntarily given, or "if the searching officer reasonably believes that the subject gave voluntary consent."  United States v. Arreola, 250 Fed. App'x 765, 767 (8th Cir. 2007) (per curiam).  The government bears the burden of proving the defendant voluntarily consented to the search.  Golinveaux, 611 F.3d at 959.

**A. Custody**

When determining whether a defendant was in custody, the court must "consider the totality of the circumstances confronting the defendant at the time of the interview," and "determine whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." United States v. Muhlenbruch, --- F.3d ----, 2011 WL 536493, at *3 (8th Cir. Feb. 17, 2011) (internal quotations omitted).  The court must focus on "objective circumstances, not on subjective views of the participants."  Id.  The following non-exclusive factors are relevant to this determination:

> (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or deceptive stratagems were employed; (5) whether the atmosphere was police dominated; or, (5) whether the suspect was placed under arrest at the end of questioning.

Id. at *3-4. The first three factors weigh against the existence of custody, while the last three factors weigh in favor of the existence of custody. United States v. Wolk, 337 F.3d 997, 1006 (8th Cir. 2003).

After considering the facts involved, the court finds that defendant Hedrick was not in custody at the time of the questioning. Although the interview occurred at the Missouri Highway Patrol Troop C Headquarters, "warnings [are] not required . . . simply because the questioning [took] place in the station house." United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004). Defendant Hedrick voluntarily agreed to give a written statement at the station, and drove alone in his own car to the station. He was never handcuffed, shackled, fingerprinted, searched, or otherwise physically restrained during the interrogation. Id. at 722. Throughout the interview, the interview room door was unlocked, United States v. J.H.H., 22 F.3d 821, 831 (8th Cir. 1994), and he retained his cellular phone, LeBrun, 363 F.3d at 722.

After reading defendant Hedrick his Miranda rights, Sgt. Paul told him that he was not under arrest. "The most obvious and effective means of demonstrating that a suspect has not been taken into custody is an express advisement that the suspect is not under arrest and that his participating in questioning is voluntary." United States v. Elzahabi, 557 F.3d 879, 883 (8th Cir. 2009), cert. denied 129 S.Ct. 2781 (2009).

The police did not employ strong arm tactics or deceptive strategies during the questioning, and the interview was not police dominated. The officers wore plain clothes, and did not display their firearms or badges other than wearing them on their belts. Defendant Hedrick was not searched or restrained in any way, and was confident enough to refuse to allow the police to search his house. After searching defendant Hedrick's trailers, garage, and outbuildings, the law enforcement officers left his property. Defendant Hedrick was not arrested. "Lack of arrest is a very important factor weighing against custody." United States v. Galceran, 301 F.3d 927, 930 (8th Cir. 2002).

Based on the above findings, the court determines that defendant Hedrick was not in custody during the interrogation.

**B. Voluntariness of Statements and Consent**

"Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by [their] maker." Vinton, 631 F.3d at 482 (internal citations omitted). "A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." Id. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Boslau, 2011 WL 500204, at *6. Factors to consider include: "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id.

When evaluating the voluntariness of a consent to search, the court must look to the totality of the circumstances under which the consent was given. United States v. Jimenez, 478 F.3d 929, 932 (8th Cir. 2007). "The ultimate question is whether the individual's will ha[s] been overborne and his capacity for self-determination critically impaired, such that his consent to search must have been involuntary." Vinton, 631 F.3d at 482 (internal citations omitted). The court must consider the suspect's characteristics and the environmental characteristics. United States v. Griffith, 533 F.3d 979, 984 (8th Cir. 2008). Suspects' characteristics include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their Miranda rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

Id. Environmental characteristics include:

> [W]hether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred.

Id.

The government has met its burden of proving that defendant Hedrick's statements and consent to search were voluntary. Hedrick voluntarily came to the station to give a statement, and was not afraid to refuse to consent to a search of his house. The police were neither physically nor mentally abusive to Hedrick, and Hedrick was not restrained or detained in any way. Boslau, 2011 WL 500204, at *6 (noting that "the investigators were not physically aggressive" and "did not create any more psychological pressure than is commonly associated with interrogations"). Although the officers stated that he might receive leniency if he cooperated, this did not overbear Hedrick's ability to not cooperate with the police. Id. (that "the investigators stated that they may prosecute [the defendant] and that they may be willing to show him leniency if he cooperated" did not "overbore [the defendant's] will"). The interview took place at the station, but was only two hours long. See Simmons v. Bowersox, 235 F.3d 1124, 1133 (two hour interrogation was "not . . . particularly lengthy").

At the time of the interview, Hedrick was 38 years old; he owned his own business; and he had no physical or mental conditions that would render his statements involuntary. Sgt. Paul also read Hedrick his Miranda rights before Hedrick made the challenged statements and gave consent. United States v. Hambrick, 630 F.3d 742, 749 (8th Cir. 2011). See also Williams v. Norris, 576 F.3d 850, 868 (8th Cir. 2009) ("[I]t is a rare case when a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda.").

Although he was not aware of the protections of the legal system by virtue of an extensive criminal history, given his age, intelligence, and the statements given by the officers, he was sufficiently aware of the protections of the legal system.

That the law enforcement officers stated that they could arrest him for his involvement and obtain a search warrant for his house does not render his statements or consent involuntary. See United States v. Bradley, 234 F.3d 363, 366-67 (8th Cir. 2000) (that officers threatened to arrest suspect's son did not render consent to search involuntary

because although "concern for his son may have been a motivating factor," he had not "acted under duress or undue pressure"); United States v. Severe, 29 F.3d 444, 446 (8th Cir. 1994) (that officers told defendant that if he refused to consent to the search, the officers would obtain a search warrant was "only one factor in the totality of the circumstances inquiry").

Based on these facts, the undersigned concludes that defendant Hedrick's statements were voluntary.

**C. Request for Counsel**

"When a defendant in custody invokes his right to counsel, the police must cease all interrogation until counsel has been made available to him." United States v. Banks, No. 4:08 CR 287 CEJ, 2008 WL 5054666, at *2 (E.D. Mo. Nov. 20, 2008). "Although the Fifth Amendment right to counsel continues throughout the duration of police custody," United States v. Arrington, 215 F.3d 855, 856 (8th Cir. 2000), the defendant must be "in custody" to claim the protections of this rule. Id. at 856-57; Banks, 2008 WL 5054666, at *2.

Because defendant Hedrick was not "in custody" at the time he said "I think I need an attorney now," there was no violation of his right to counsel. Banks, 2007 WL 5054666, at *2.

Further, a suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459 (1994). Defendant Hedrick's statement, "I think I need an attorney now," has been found ambiguous by other courts, such that officers need not end questioning. Haplin v. Crosby, 8:97 CV 46-T-27EAJ, 2006 WL 709307, at *12 n.16 (M.D. Fla. Mar. 21, 2006). See also Davis, 512 U.S. at 462 (holding the defendant's statement, "Maybe I should talk to a lawyer," was ambiguous and thus not a request for counsel); Burket v. Angelone, 208 F.3d 172, 198 (4th Cir. 2000) (holding the defendant's statement, "I think I need a lawyer," was not an unequivocal request for counsel).

## III. CONCLUSION

For the reasons stated above,

**IT IS HEREBY RECOMMENDED** that the oral and written motions of defendant Brian Lewis Hedrick to suppress evidence (Docs. 59, 96, 117) be denied.

**IT IS FURTHER RECOMMENDED** that the motion by the government for determination by the court of the admissibility of arguably suppressible evidence (Doc. 60) be denied as moot.

**IT IS HEREBY ORDERED** that the motion of defendant Brian Lewis Hedrick for severance (Doc. 95) is denied without prejudice to be refiled during trial with a sufficient showing of prejudice.

The parties are advised that they have 14 days to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 7, 2011.